THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD MAU, Defendant-Appellant.

Third District    No. 80-107

Opinion filed September 29, 1980.

Robert Agostinelli and Thomas Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:
Appealing from his conviction, following a jury trial, for armed

robbery and the consequent sentence of six years, the minimum sentence prescribed for armed robbery (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2 (b), 1005—8—1 (a) (3)), the defendant, Ronald Mau, raises two issues for our consideration. The first is whether, in order to mitigate the allegedly unduly harsh sentence, this court should reduce the degree of the offense.

■■ A court of review, however, will not reduce the degree of offense purely out of merciful benevolence. There must exist some evidentiary weakness upon which the court can rely in reducing the degree of the offense. See, *e.g.*, *People v. Coleman* (1979), 78 Ill. App. 3d 989, 398 N.E.2d 185.

In the case at bar, there is no such evidentiary weakness. Todd Wolfe testified that he was working in the Convenient Food Mart at 328 Republic Street in Joliet on the night of September 26-27, 1978. Normally two employees would be involved in closing the store at midnight and often a police officer would also be present, but on that night, only Wolfe was present. After he locked the door to the store and went to the back room, he heard someone pound on the door and then heard the glass break.

The person at the door held a shotgun, and wore blue jeans, a green jacket which was too large for him and a red shirt over his head, with holes cut out to see through. He was a slightly built white person about 20 years old, and the gun was rusty and had an extension cord wrapped around it.

The robber pointed the gun at Wolfe and told Wolfe not to move or he would be shot. Wolfe was directed to the checkout counter and placed the money from the register on the counter. Wolfe was then ordered to get the money from the safe under the counter. Wolfe placed the money on the counter, and the robber picked up a paper bag and put the money inside, laying the gun on the counter while he filled the bag. Wolfe asked whether the robber wanted the change and received an affirmative response. A short time later the robber said, "No more," and Wolfe then stood up. Over $1000 was taken from the store.

Wolfe noted that the robber was bleeding from his left hand, and he tried to use his coat sleeves to wipe the counter. Other State witnesses established that a blood specimen was obtained from a paper bag on the counter. Serologists found the blood type to be Type O, Rh negative, Type MN, a blood type found in about 3.3% of the white population. A sample of the defendant's blood was tested and was also found to be Type O, Rh negative, Type MN.

On October 9, 1978, Joliet Detective David Gerdes talked to the defendant. After explaining his *Miranda* rights, Gerdes informed the defendant he was a suspect in the armed robbery of the store. While denying any involvement, he explained the bandage on the middle finger of his left hand by telling Gerdes he had cut his finger on a piece of glass when a

window on an inner door of an apartment at 804 North Broadway Street broke as the defendant was trying to open it.

After checking the apartment and finding no broken windows, Gerdes confronted the defendant with the apparent falsity of his earlier story. In response, the defendant maintained that the window was still broken, but then stated he had repaired it himself. When asked why he changed his story, the defendant responded that he was not responsible for the robbery. It was also established through Gerdes' testimony that, at the time of his arrest, the defendant was 20 years old, five feet, eight inches tall, and weighed approximately 145 pounds.

James Woolsey, who shared an apartment with the defendant, was the State's final witness. Woolsey testified that, after going to bed on September 26, he was awakened by the defendant knocking at the door. When Woolsey opened the door, the defendant had two bags of money, was bleeding from the middle finger of his left hand, and was wearing a large green coat and jeans.

When the defendant opened his coat, Woolsey observed a sawed-off shotgun tied to the defendant's shoulder. The gun was old and had an electrical cord attached to it. The two then counted the money, which amounted to somewhere between $1100 and $1300. Later, on the morning of September 27, the defendant told Woolsey that he had robbed the Convenient store. The defendant indicated that he had been watching the store for a couple weeks and stated that he parked a few blocks away, waited until closing and entered with a T-shirt around his head. According to Woolsey, the defendant was alert and talked and walked normally on September 27, although the defendant was pale from probable drug usage. There was also testimony by Woolsey that the defendant had asked why Woolsey had talked to the police and had stated that some of his friends would be pretty upset if he were jailed. The defendant said, "One house has already been broken up. Just take it from there."

For the defense, the defendant's parents, aunt, brother, employer and neighbor testified to the abnormal behavior of the defendant resulting from the defendant's use of drugs. Two psychiatrists also testified on the defendant's behalf.

Dr. Bento discussed his diagnosis of the defendant as unfit to stand trial and insane in March 1979, when the defendant suffered from an acute schizophrenic episode or latent paranoid schizophrenia awakened by drug use. Dr. Benton also diagnosed the defendant as legally sane on the date of the offense, relying on police reports and Woolsey's statement to the police for the diagnosis. When presented with various circumstances of the offense on cross-examination, Benton indicated that those circumstances were consistent with sanity.

Dr. Langner testified that at the time of the defendant's admission to Mercyville in March 1979, the diagnosis of defendant's condition was the same as when he had been at St. Joseph's Hospital in January 1978. The defendant was disorganized, delusional, psychotic and paranoid. On the date Langner met the defendant, the defendant was clearly psychotic, as he was agitated, disheveled, in need of restraint, totally confused, unable to relate to people and in a state of complete mental collapse. The defendant's "tremendous" history of drug abuse compounded his problems. Langner found that the defendant was disturbed before his use of drugs began, as the defendant was hyperactive, hyperrebellious and never formed appropriate peer relationships. As peer pressure increased in high school, the defendant started feeling more like a failure, was unable to cope and turned to drugs as an escape from the confusion and inadequacy he felt. The defendant became involved with a questionable group of youths involved with drugs, and his problems worsened. The defendant became schizophrenic. with a secondary drug problem. He was impulsive and showed poor judgment. The defendant retreated from reality and experienced delusions and hallucinations. At the time of his admission to Mercyville the defendant was fragmented and panic-stricken, like a trapped animal, and hospitalization was necessary. The defendant was a very serious case with no insight into the extent of his condition. The defendant acted bizarrely, thought music was real and tangible and was emotionally flat or burned out.

During his time at Mercyville, the defendant pulled himself together and improved greatly. The defendant developed a relationship with Langner and progressed remarkably so that he could relate to others and display some insight. A mutual decision to release the defendant was made after in-patient care could do no more for him. The defendant's return to work and appropriate habits were positive signs. Langner, however, did not examine the defendant for his sanity at the time of the offense, but believed that the defendant was not then in good shape psychologically.

■■ After reviewing the facts, we do not believe this is the type of case which would warrant the reduction of the degree of the offense. The second issue raised by the defendant is whether the armed robbery statute's six-year mandatory minimum term of imprisonment is unconstitutional as applied to him.

■■ It is the province of the legislature to determine whether an evil exists and what means are appropriate to prevent or punish that evil (*People v. Boucher* (1979), 75 Ill. App. 3d 322, 394 N.E.2d 60), and the courts are reluctant to override the judgment of the general assembly with respect to criminal penalties (*People v. Cantrell* (1973), 14 Ill. App. 3d 1068, 304 N.E.2d 13), because the minimum sentence imposed for a given offense

reflects the legislature's judgment as to both the seriousness of the offense and the belief that a specific rehabilitative period is necessary. (*People v. Wright* (1974), 18 Ill. App. 3d 1028, 310 N.E.2d 494.) Only where the penalty prescribed by statute is so disproportionate to the offense that it shocks the moral sense of the community or is cruel or degrading will the courts override the judgment of the legislature with respect to a criminal penalty. *People v. Houston* (1976), 43 Ill. App. 3d 677, 357 N.E.2d 184.

When the constitutionality of the sentence legislatively mandated for armed robbery convictions prior to February 1, 1978, was challenged, this court found that the then statutory minimum sentence, which provided no possibility of probation, did not violate article I, section 11, of the Illinois Constitution of 1970. (*People v. Hamann* (1975), 28 Ill. App. 3d 737, 329 N.E.2d 32.) That section, upon which the defendant bases his argument in the present case, requires that penalties be determined "according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

■■ The defendant here argues that, as applied to him, the statute is unconstitutional. However, considering the seriousness of the crime of armed robbery and the dangers inherent in the commission of that offense, the moral sense of the community is not offended by a six-year minimum term for armed robbery, even though this youthful defendant had no prior felony convictions and had some psychological and drug abuse problems. See *People v. Wright* (1974), 18 Ill. App. 3d 1028, 310 N.E.2d 494.

Accordingly, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

ALLOY, P. J., and BARRY, J., concur.